Law Offices of Peter L. Kutrubes
Peter L. Kutrubes, SBN 176024
Stephen P. Lin, SBN 201150
1415 Oakland Boulevard, Suite 102
Walnut Creek, California 94596
Telephone: (925) 939-9600
Facsimile: (925) 256-7660

Attorneys for Plaintiff Marci Patera

UNITED STATES DISTRICT COURT,

NORTHERN DISTRICT OF CALIFORNIA

MARCI PATERA                              )   Case No.:
                                          )
                                          )   **COMPLAINT FOR DAMAGES:**
                                          )
Plaintiff,                                )   (1) DECEIT: PROMISE MADE
                                          )       WITHOUT INTENT TO PERFORM;
vs.                                       )   (2) DECEIT: INTENTIONAL
                                          )       MISREPRESENTATION;
                                          )   (3) FRAUD & DECEIT: SUPPRESSION
                                          )       OF MATERIAL FACTS;
CITIBANK, N.A., a national banking        )   (4) FRAUD & DECEIT: NEGLIGENT
                                          )       MISREPRESENTATION;
association; CITIMORTGAGE, Inc., a        )   (5) NEGLIGENCE;
                                          )   (6) VIOLATION OF BUSINESS &
corporation; *et al*. and Does 1-25,      )       PROFESSIONS CODE SECTION
                                          )       17200, *et seq.*;
                                          )   (7) PROMISSORY ESTOPPEL;
    Defendants.                           )   (8) BREACH OF CONTRACT;
                                          )   (9) BREACH OF CONTRACT
                                          )       (OCTOBER 2012 LOAN
                                              MODIFICATION AGREEMENT);
                                              (10) SLANDER OF TITLE;
                                              (11) CANCELLATION OF
                                                   INSTRUMENTS;
                                              (12) VIOLATION OF ROSENTHAL FAIR
                                                   DEBT COLLECTION PRACTICES
                                                   ACT;
                                              (13) BREACH OF THE COVENANT OF
                                                   GOOD FAITH AND FAIR DEALING;
                                              (14) DECLARATORY RELIEF.

**COMES NOW** Plaintiff MARCI PATERA and alleges as follows:

1.      Plaintiff Marci Patera (hereinafter "**Patera**" or "**Plaintiff**") and her ex-significant other Roy Bartlett (hereinafter "**Bartlett**") purchased and jointly own the property which is the subject of this Complaint, commonly known as **308 Iron Horse Court, Alamo, California, 94507** in or about **March of 1999** (hereinafter, the "**Property**"), the legal description of which is attached hereto as "Exhibit A".   In order to Purchase the Property, Patera and Bartlett borrowed approximately $1,000,000 from Defendant Citibank, N.A.'s (hereinafter, individually, "**Citibank**", or collectively with all other defendants, "**Defendants**") predecessor in interest, Citibank Service Corporation.  Citibank is a national banking association organized under the laws of the United States.

2.      For over 20 years, Bartlett has been a client of Citibank Private Banking.   Patera was not a Citibank Private Banking client.  The Property purchase was arranged through Citibank Private Bank.

3.      Defendant **CitiMortgage Inc.** (hereinafter, "**CitiMortgage**") operates as a subsidiary of Citibank.  Citibank Service Corporation was the trustee and Citibank F.S.B. was the beneficiary of the mortgage loan in this case from the inception of the loan in or about March, 1999. At some point in time thereafter, Citibank's ownership interest in the Property was transferred to **CitiMortgage** and since then CitiMortgage has continued in its capacity as servicer of the loan(s) that are the subject of this lawsuit.

4.      Plaintiff is informed and believes, and based thereon, alleges, that CitiMortgage is operated as a division of Citibank, that they are for all essential purposes one and the same, and that they are therefore jointly and severally liable for any and all of the conduct of one another, as alleged herein.

5.      Plaintiff is informed and believes and, based thereon, alleges **Northwest Trustee**

Complaint for Damages-2

**Services, Inc.** (hereinafter, "**Northwest**") is a corporation organized under the laws of the State of Washington but registered to do business in the State of California. Plaintiff is also informed and believes that Northwest is in the business of conducting foreclosures in California.

6. The Defendants herein named as "all persons unknown, claiming any legal or equitable right title, estate, lien or interest in the property described in the Complaint adverse to Plaintiff's title or any cloud on Plaintiff's title thereto" are hereinafter sometimes referred to as the "unknown defendants" and are currently unknown to Plaintiff. These unknown defendants and each of them claim some right, title, estate, lien or interest in the Subject Property, adverse to Plaintiff's title. Their claims, and each of them, constitute a cloud on Plaintiff's title to the Property.

7. Plaintiff is ignorant of the true names and capacities of Defendants sued herein as Does 1 through 25, inclusive, and therefore sues these Defendants by such fictitious names. All persons unknown, claiming any legal or equitable right, title, estate, lien or interest in the Property described in this Complaint adverse to Plaintiff's title or any cloud on Plaintiff's title thereto are to be named as Doe defendants, accordingly. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

8. Defendants sued herein as DOES 1-25 are contractually or otherwise legally liable and/or otherwise jointly, severally and legally responsible in some manner for each and every act, omission, obligation, event or happening set forth in this Complaint.

9. The use of the term "Defendants" in any of the allegations in this Complaint, unless specifically or otherwise set forth, is intended to include and charge both jointly and severally, not only named Defendants, but all Doe defendants designated as well.

10. Plaintiff is informed and believes and, based thereon, alleges that, at all times

mentioned herein, Defendants were agents, servants, employees, alter egos, superiors, successors in interest, joint-venturers and/or co-conspirators of each of their co-defendants and in doing the things hereinafter mentioned, or acting within the course and scope of their authority of such agents, servants, employees, alter egos, superiors, successors in interest, joint-venturers and/or co-conspirators with the permission and consent of their co-defendants and, consequently each Defendant named herein and those Defendants named herein as DOES 1 through 25, inclusive, are jointly and severally liable to Plaintiff for the damages and harm sustained as a result of their wrongful conduct.

11. Defendants, and each of them, aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations to Plaintiff, as alleged herein. In taking action, as alleged herein, to aid and abet and substantially assist the commissions of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals and wrongdoing.

12. Any applicable statutes of limitation have been tolled by the Defendants' continuing, knowing, and active concealment of the facts alleged herein. Despite exercising reasonable diligence, Plaintiff was prevented from discovering the wrongdoing complained of herein.

13. In the alternative, Defendants should be estopped from relying on any statutes of limitation. Defendants have been under a continuing duty to disclose the true character, nature and quality of their financial services and debt collection practices. Defendants owed Plaintiff an affirmative duty of full and fair disclosure, but knowingly failed to honor and discharge such

duty.

**Factual Background**

14.     On or about March 1, 1999, Plaintiff and Bartlett entered into a mortgage loan transaction with Defendant Citibank to finance the purchase of their home, the Property in Alamo California.  The loan was arranged through the Private Banking Division of Citibank.  Plaintiff executed a Promissory Note ("Note") as part of the loan transaction.  This was referred to as the "first mortgage".

15.     Starting in or about April of 1999, Patera, Bartlett and their minor children lived in the Property; it was their family home.  The monthly mortgage payments were timely made for many years.

16.     In approximately 2001, Citibank Private Bank arranged for Bartlett and Patera to take out another loan with CitiMortgage.  This loan also was accompanied by a Promissory Note and Deed of Trust and was serviced by CitiMortgage.  This loan was referred to as the "second mortgage".  Timely payments were made on the second mortgage for years.

17.     In approximately 2004, Citibank Private Bank arranged for Bartlett and Patera to take out another loan with CitiMortgage. This loan also was accompanied by a Promissory Note and Deed of Trust and was serviced by CitiMortgage.  This third loan was referred to as the "third mortgage".  Patera and Bartlett made timely payments on the first, second and third mortgages held by Citibank (and its various subsidiaries and successors in interest).

18.     In approximately July 2007, Patera became physically disabled.  Despite her resultant loss of income, the monthly mortgage payments continued to be timely paid, although savings and retirement began to be depleted.

19.     As of November 2010, Bartlett and Patera were still current on the first, second

Complaint for Damages-5

and third mortgages for the Property.  However, in or about November 2010, Patera was told Bartlett would soon be losing his job.   Bartlett indicated his last day at his job would be December 31, 2010.  He indicated he would be setting up his own business.  The mortgage payments on the Property started falling behind.

20.     Bartlett informed Patera that they would not be able to generate enough income to make the monthly mortgage payments of approximately $9,500 (for principal and interest payments on a monthly basis).  Patera was informed that Bartlett had started contacting Citibank Private Bank to attempt to make "hardship" arrangements.  Edith Mims, Vice President of Citigroup Risk Management, sent a "Hardship Assistance Package" (hereinafter "HAP") to Bartlett in or about March 2011.  The HAP was completed by Bartlett and submitted to Citibank in or about April 2011.  On or about May 17, 2011, Edith Mims advised Bartlett she had received the HAP and indicated the target date for processing the loan modification(s) was to be May 25, 2011, as Citibank Private Bank was apparently "extremely busy" at that time.  Ms. Mims also indicated that none of the Citibank loans were in foreclosure and that Citigroup Private Bank should be the only point of contact.

21.     In or about early June 2011, Bartlett forwarded to Patera an email between him and Vita Cusumano, Director, Citibank Private Bank.  The email indicated that the application for a loan modification had been approved, and identified the key terms of that modification. Bartlett and Patera subsequently accepted the proposed loan modification.  The terms of the June 2011 loan modification agreement included a lower interest rate, forgiveness of all late fees and penalties accumulated to date, and a lower monthly payment of approximately $5,996.93 (principal and interest) for all 3 mortgage loans secured against the Property.  Bartlett indicated that Mr. Cusumano told him that he needed to start making the new modified monthly payments

on June 15, 2011.  In the meantime, Bartlett indicated that Citibank was drawing up loan modification papers for both Bartlett and Patera's signatures.

22.     On or about June 11, 2011 Bartlett sent an email to Mr. Cusumano, stating he had tried twice on June 10, 2011 and once on June 11, 2011 to make the requested payments (pursuant to the new modified loan(s)) but the system would not let him do this online.  Patera was copied on this email on January 29, 2013.

23.     On June 13, 2011, Mr. Cusumano sent an email to Edith Mims, Vice President of Citigroup, and copied Bartlett, asking if Citibank could debit Bartlett's Citibank account to make the required payment.  On June 14, 2011, Mr. Cusumano of Citibank, emailed Bartlett and copied Ms. Mims, that the payments were debited successfully by Citibank.  These emails were ultimately copied to Patera on January 29, 2013.  The fact that the loan payments were successfully debited from Bartlett's account(s) was also reflected in Bartlett's bank statements of June 2011, which show the modification payments being directly withdrawn from Citibank in New York on June 15, 2011.  On August 7, 2011, Citibank's attorneys forwarded to Patera, Substitute Payment Tickets dated June 14, 2011 and signed off by Edith Mims and Robert Cotugno, AVP, Risk Management, SARG Citibank New York.

24.     Bartlett indicated he had followed up several times via email and telephone in June and July 2011, concerning the loan modification papers.  According to Bartlett, Mr. Cusumano did not respond. Patera's telephone calls to Citibank were not returned.  Bartlett later indicated that when he attempted to make a later monthly mortgage payment, his payments to the mortgage accounts were blocked.

25.     In September 2011, Patera was forwarded an email between Assistant Vice President, Suzanne Douglas, Citigroup, Inc. / Citibank Private Bank and Bartlett.  The email

Complaint for Damages-7

indicated that Citibank was in receipt of the HAP and Vita Cusumano had retired. Citibank was now asking for an appraisal of the property.

26.    On October 14, 2011, Ms. Douglas <u>indicated that the loan modification was again being submitted to Citibank "upper management".</u>

27.    On October 27, 2011, Bartlett sent an email to Ms. Douglas indicating that he still hadn't heard regarding the status of the loan modification.

28.    On October 27, 2011, Ms. Douglas responded that the loan modification(s) were "in process and likely to be wrapped up in November 2011".

29.    On November 16, 2011, Patera sent an email to Ms. Douglas asking about the status of the loan modification(s).

30.    On November 17, 2011, Ms. Douglas responded to Patera's email, stating that <u>key people had gone on vacation and Citibank was working on the loan modification(s) "today".</u> She then forwarded proposed loan modification terms to Patera and Bartlett.

31.    On November 29, 2011, Ms. Douglas emailed Bartlett and Patera and asked if the proposed loan modification terms were "doable

32.    The proposed loan modifications were subsequently agreed upon and on December 7, 2011, Ms. Douglas indicated that the loan <u>modifications would be forwarded to Citibank "upper management" (again).</u>

33.    On December 13, 2011, Ms.Douglas advised Bartlett and Patera that they would need to fill out an entirely new HAP. It had now been approximately nine months since Bartlett applied for the loan modification and six months since Bartlett and Patera received the approval to their loan modification application.

34.    On December 16, 2011, Patera emailed Ms. Douglas confirming that all requested

supporting income documentation had been re-sent to the appropriate Citibank representatives.

35.  On January 9, 2012, Patera emailed Ms. Douglas, requesting a status on the loan modification(s), as there had been no communication from Citibank since December 2011. There was no response from Ms. Douglas.  Patera telephoned Ms. Douglas several more times, but received no response to any of her inquiries.

36.  Though Patera attempted to make contact with Citibank representatives in that period of time, she heard nothing from in or about mid-December 2011 (when she confirmed with Suzanne Douglas that there was no additional information required of them to process the loan modification(s)) until in or about February 2012.  Again, over 6 months had passed since Patera had been informed of the issue of Vita Cusumano's retirement.

37.  In or about early March 2012, Bartlett informed Patera that he received a telephone call from Suzanne Douglas at Citibank, stating that requests for loan modification(s) were now likely to be denied. This was in stark contrast to approvals that Bartlett and Patera had received in or about June 2011.  Ms. Douglas advised Bartlett and Patera that their loan modification was now handed off to a Stephen Eustace.

38.  On March 2, 2012, Bartlett and Patera telephoned Mr. Eustace, Director at CitiPrivate Bank Risk Management and left a voice message.

39.  On March 6, 2012, Bartlett and Patera sent an email to Suzanne Douglas stating that they had still had not received a response from Mr. Eustace.

40.  On March 6, 2012, Mr. Eustace responded to Bartlett's email stating he was "managing many requests" and expected to be able to call Patera or Bartlett back "tomorrow, to discuss".

41.  As of March 12, 2012, Patera had still not heard from Mr. Eustace.  Bartlett sent

another follow-up email to Mr. Eustace asking if "we could talk this week".  Mr. Eustace responded on March 12, 2012, saying he would respond "as soon as possible", but there were "many requests that needed to be considered and we (Citibank Private Bank) are attempting to get to them as soon as possible".

42.     As of March 20, 2012 there had still been no further contact from Mr. Eustace. An email, however, was received from Homeowner Support Specialist Fermina Villanueva, stating she was working "alongside Mr. Eustace and Ms. Douglas" and that Mr. Eustace would be calling that afternoon.  Patera never received a follow-up call from Mr. Eustace.

43.     Patera placed several telephone calls in March and April 2012 to Ms. Villanueva and Mr. Eustace. Neither responded to Patera's telephone calls or messages.  On April 26, 2012, Patera sent an email to Ms. Villanueva indicating that Patera was told in early March that Mr. Eustace would be contacting Patera and Bartlett regarding the further negotiation of (loan modification) terms, and yet she had still not heard from him.

44.     On April 26, 2012, Ms. Villanueva indicated she had forwarded Patera's inquiry to Ms. Douglas and Mr. Eustace and she was "waiting for a reply".

45.     On April 27, 2012, Mr. Eustace sent an email to Bartlett asking if they could talk on May 1, 2012.  Bartlett talked to Mr. Eustace and then confirmed with Patera the time and day that the phone conversation would occur.

46.     On May 1, 2012, Patera sent a confirming email, after the telephone call between Patera, Bartlett and Mr. Eustace, that no further information was needed from Patera (to complete the pending loan modification application).

47.     On May 7, 2012, Bartlett supplied further documentation regarding his income to Mr. Eustace.

Complaint for Damages-10

48.     However, since May 7, 2012, Mr. Eustace failed to respond to follow-up emails and telephone calls throughout May, June and early July 2012.

49.     On July 16, 2012, Patera was informed by Bartlett that he had a conversation with Suzanne Douglas who indicated the "loan modification (applications) were still in process" and that Mr. Eustace would try to call the next day.

50.     On July 17, 2012, an email was sent from Bartlett to Mr. Eustace requesting a specific time to call in for the telephone call.  Mr. Eustace indicated on a call to Bartlett that they "should check in on July 19, 2012".

51.     On July 19, 2012, Bartlett and Patera called Mr. Eustace's number and left a message.  A follow-up email was sent to Mr. Eustace.

52.     On July 19, 2012, Mr. Eustace responded that he had been going through Patera and Bartlett's file and needed to discuss with his "senior" manager(s) and that he would speak to Bartlett and Patera to follow-up on the following Monday, July 23, 2012.

53.     On July 24, 2012, Patera and Bartlett spoke with Mr. Eustace. He said that the loan modifications "looked good" and that he had secured "preliminary approval" but that they needed to be "finalized".  A follow-up call was scheduled for the next day.  Mr. Eustace indicated he would call Patera and Bartlett on July 25, 2012 with his decision.  When July 25, 2012 arrived, Mr. Eustace made no telephone call to Patera.

54.     On August 3, 2012, Mr. Eustace sent an email to Bartlett indicating he would be "finalizing his decision this afternoon.".  Mr. Eustace said he would like to speak to Bartlett and Patera on Monday, August 6, 2012.  As of August 10, 2012, Patera had not received a phone call or email response from Mr. Eustace.

Complaint for Damages-11

55.     On September 11, 2012, Bartlett sent an email to Mr. Eustace and Suzanne Douglas indicating that Patera and Bartlett had still not heard on the status of the loan modifications.  Mr. Eustace had now been involved in the review of these files for at least 8 months and there still was no answer.

56.     On September 13, 2012, Ms. Douglas responded to Bartlett stating she would be following up with Mr. Eustace and "pulling the files".  She indicated that she would ask Mr. Eustace to call Bartlett and Patera the next day.  Patera received no telephone call or email from either Suzanne Douglas or Stephen Eustace the next day.

57.     Patera then attempted to contact Mr. Eustace and Ms. Douglas but received no response.  On October 5, 2012, Patera once again emailed Mr. Eustace, Director of Citibank Private Bank, as to the status of the loan modifications.  Patera received no response.

58.     On October 9, 2012, Patera's attorney, Lisa Radcliffe (who was briefly hired by Patera to handle a consolidated family law/settlement matter), emailed Suzanne Douglas, since Patera's correspondence to Citibank over the last year were habitually not being returned and the lack of response had the potential to impact settlement discussions between Patera and Bartlett that were occurring contemporaneously in the Contra Costa County Superior Court.

59.     On October 9, 2012, Ms. Douglas emailed Patera's attorney that the "workout" was out of her hands and it was being decided by Mr. Eustace.

60.     On October 9, 2012 Patera spoke with Mr. Eustace wherein he stated that the loan modifications had been approved and the only question was whether the modification(s) would be done as "one loan or three", as had been approved previously.  He indicated there would be "forgiveness" of interest, late fees and penalties and there would be a lower (fixed) interest rate. Mr. Eustace told Patera he would get back to her the next day.  This was documented in the

email of October 9, 2012 from Mr. Eustace confirming the loan modification and that the only question was whether the modification would be "one loan or three loans" as was done in June 2011. Mr. Eustace indicated he would have the "game plan" by no later than close of business Wednesday, October 10, 2012.

61.     Despite several follow-up telephone calls and emails from Patera, Mr. Eustace did not respond to Patera. Neither did Fermina Zarate (a self-identified Citibank "Homeowner Support Specialist"), who Patera was told was also working on these loans. Patera received no response as to when the loan modification papers would be received and was not told there was any issue with the modification. In fact, when Patera requested a payoff demand, Citibank Private Bank failed to respond to even those requests by Patera.

62.     On October 22, 2012, Patera sent an email to Fermina Zarate indicating that Patera spoke to Mr. Eustace a few weeks before and was requesting the payoff amounts as Mr. Eustace indicated there would be a forgiveness of some of the accrued interest and late fees and penalties. Again, Patera received no reply from Citibank. It had now been almost a year since Citibank had indicated there was a change in staff and there was an additional review.

63.     On November 7, 2012, Patera again emailed Mr. Eustace as to the loan modifications. Mr. Eustace again did not return any telephone calls or (the November 7, 2012) email.

64.     On November 16, 2012, an unidentified person from Citibank called Patera and advised that she and Bartlett <u>needed to submit another (loan modification) application.</u> Patera had still not received a response to her repeated telephone calls to Mr. Eustace or to Ms. Zarate regarding the approved loan modifications.

65.     On November 18, 2012, Bartlett's attorney advised that he had received a **Notice**

**of Default and Election to Sell**, that **CitiMortgage had apparently filed and recorded on November 1, 2012**.  This Notice of Default was filed during the same period of time that Patera had been repeatedly trying to contact Mr. Eustace regarding his email which purportedly approved the loan modifications on October 9, 2012.  The filing of the Notice of Default was contrary to the approved June 2011 loan modification, the approved modification Mr. Eustace communicated to Patera on October 9, 2012 and the assurances given by Mr. Eustace that CitiMortgage **would not pursue further default procedures** as the bank had stated on several emails that the delays were due to factors on their end (*i.e.*, people had gone on vacation and they were subsequently behind, that there were many requests they were handling so they would get to it when they could, or they simply claimed they would have an answer on a certain date and then stated that they were going to be out of the office or someone they needed to speak with regarding the modification was out of the office). Throughout this period of time, CitiMortgage representatives continually claimed they were "too busy", and that they were "getting" to the necessary tasks "as fast as they can".

66.    On November 26, 2012, Mr. Eustace finally responded to Patera, almost 2 months after he had indicated the loan modifications had been approved. Mr. Eustace stated that the responsibility for default servicing of delinquent Private Banking mortgage loans was recently transitioned from the Private Bank to CitiMortgage and that the main point of contact was now Homeowner Support Specialist Fermina Zarate (Villanueva).  Patera and Bartlett called Ms. Villanueva asking to talk about the loan modifications they had applied for and received approvals.  Ms. Villanueva answered Patera and Bartlett by sending a **new application to be filled out, along with a new request for additional supporting documents.**

67.     On November 26, 2012, Patera was informed that Bartlett's attorney had received **another Notice of Default**.

68.     In January 2013 a new HAP was completed by Bartlett and Patera and was to be underwritten by CitiMortgage.

69.     Through follow-up telephone conversations and emails Patera and Bartlett had with CitiMortgage, it became evident that CitiMortgage representatives continued to "misplace" documents submitted by Bartlett and Patera. Patera continued to resend documents that had already been previously provided to CitiMortgage, on numerous occasions, at CitiMortgage's request.

70.     On January 29, 2013, Bartlett emailed Tolisha Newton (and copied Patera) on the June 2011 emails between Vita Cusumano, Edith Mims and Bartlett regarding the modifications that were approved.  On February 11, 2013, after further conversations regarding missing or misplaced documents in the three files, Tolisha Newton (Homeowner Support Specialist) of CitiMortgage confirmed that they had "everything" and they were now awaiting "underwriting assignment" by the end of the next week.  On February 22, 2013, a phone call between Victor Tobin of Citibank, Patera and Bartlett underlined confirmed that Citibank now "had all the information required for underwriting (again) and that they would not pursue any further (foreclosure) action." On February 25, 2013, Bartlett received a Notice of Trustee Sale, and the sale was scheduled for March 21, 2013.  On or about March 15, 2013, the sale date was cancelled, but a new sale date was scheduled for April 8, 2013.  This clear evidence of dual tracking, *i.e.* continuous scheduling of sale dates, moving the sale dates just before the foreclosure(s), and continued lack of updates regarding the status of underwriting of the pending loan modifications

continued throughout 2013, and was acknowledged in a letter from CitiMortgage, dated August 29. 2013.

71.     As an example, an email on August 22, 2013 sent to Patera from Myra Kindred of CitiMortgage indicated there was still no status on underwriting of the files.  Patera followed up with a further email on August 26, 2013.

72.     On August 28, 2013, Bartlett's attorney received two (s) Notices of Trustee Sale dated August 22, the date Ms. Kindred indicated there was still "no status" on the pending loan modification applications, and after Patera's email had been sent requesting status.  In late September 2013, due to the lack of communication and continual issues with Citibank, Patera enlisted the services of **Operation Reach** to assist her.

73.     On October 2, 2013, Operation Reach lodged a dispute with Citibank citing the California Homeowner Bill of Rights (hereinafter the "CAHBR"), dual-tracking practices of Citibank and Citibank's failure to communicate loan information to Patera.

74.     In October 2013 Citibank offered a loan modification only on the second mortgage loan, but failed to disclose the exact terms of the proposed modification in the underlying documents.  Citibank set a trustee sale of the property for November 2013, even though there was a loan modification pending.

75.     On November 12, 2013, Operation Reach again contacted Bryan Bolton, Director of Default Servicing for Citigroup, on behalf of Patera, regarding the dual-tracking issue and lack of terms provided for in the loan modification for Patera's second mortgage loan.

76.     On November 13, 2013, Bartlett's attorney received yet another Notice of Trustee Sale regarding the 2nd mortgage, which had been "currently approved" for modification.  The underlying modified loan terms had never been disclosed to Patera by Citibank and this fact had

been noted in previous emails to Mr. Bolton.  The second mortgage was now scheduled (to trigger) a foreclosure on December 12, 2013.

77.    A subsequent letter dated January 27, 2013 that was sent to Bartlett's address, indicated that Citibank had approved 3 trial modifications on November 13, 2013.  This was the same date Bartlett's attorney received the Notice of Trustee Sale for December 12, 2013. Patera was not notified of these approved modifications until late November 2013.

78.    In fact, on November 22, 2013, Myra Kindred of Citibank, emailed Patera that as Patera was aware, only one loan was ever "approved" for modification, and foreclosure was imminent.  In that email from Myra Kindred, Patera was informed that her only options concerning her home were short sale, foreclosure or repayment.  This was contrary to Citibank's letter of November 27, 2013, wherein Citibank indicated all three loans had been approved for modification.   Even after several emails in late November and early December from Patera and Operation Reach requesting the terms on the three modifications that were now said to be approved, Citibank did not respond.

79.    Given the confusion created by Citibank and CitiMortgage, foreclosure should not have been imminent.  This again constituted a clear violation of  the CAHBR and the underlying 2012 "National Settlement Agreement" between the five largest national banks (lenders) and 49 State Attorney Generals.

80.    On November 25, 2013, Patera was finally notified that there were approved modifications on all three (3) loans. This was news to Patera.  Patera emailed Bryan Bolton, that she was never informed of the loan modifications or the underlying terms of the modifications. As the co-borrower and co-owner of the property, Patera should have been receiving communication(s) regarding the status of the pending loan modification(s).

81.     On November 26, 2013, Operation Reach emailed Bryan Bolton, requesting information regarding the three (3) loan modifications that were now said to have been approved. Operation Reach also stated that Patera was entitled to communication and documentation regarding these pending loan modifications. There was no response as to the underlying terms.

82.     On December 4, 2013, Patera emailed Bryan Bolton that she had still not received any direct information from Citibank on the loan modifications. Operation Reach confirmed with Northwest Trustees that the sale of the property was still scheduled for December 12, 2013.

83.     On December 5, 2013, Patera received an email from Bryan Bolton that 'someone is looking into' the loan modification(s) application status.

84.     Also, on December 5, 2013, Operation Reach sent an email to Bryan Bolton requesting a postponement of the foreclosure scheduled for December 12, 2013, as underlying terms of the loan modification(s) had still not been disclosed.

85.     On December 6, 2013, an email was received from Bryan Bolton to Operation Reach and Patera stating he had "changed positions" and was "no longer the (main) point of contact" and that Eric Jorgensen would be "handling the files and would be the (main) point of contact".

86.     Patera sent several follow-up emails attempting to get payoff information from Citibank, which was originally requested in writing in 2012 and January 2013.

87.     The December 12, 2013 foreclosure date was postponed. On December 28, 2013, Patera was notified that the loan files were now in Citibank's litigation department.

88.     During 2014 Patera continued to request documents from Citibank, which included payment histories, payment breakdowns, Broker's Price Opinions, and appraisals. When Patera received some of the documents she noticed they didn't match documents that had

previously been provided to her by Citibank or CitiMortgage or any other related Citibank entity. The payment histories reflected numerous irregularities.  This was the beginning of an ongoing effort to determine what had transpired over the course of Citibank's (and its related entities') modification review process.

89.    Plaintiff is informed and believes and thereon alleges that the Defendants who made the representations herein, are the authorized agents of Citibank, and, at the time of the making of the representations herein alleged and at all times herein mentioned were acting within the course and scope of his/her/their employment and authority for Citibank or its predecessors in interest.

90.    **Agency.**  Plaintiff is informed and believes, and on that basis alleges, that all times herein mentioned, each of the Defendants was an agent, employee, of each of the remaining Defendants, was at all times acting within the course and scope of such agency, service, employment; and each Defendant has ratified, approved, and authorized the acts of each of the remaining Defendants with full knowledge of said facts.

91.    **Aiding and Abetting/ Conspiracy**.  Defendants, and each of them, aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations to Plaintiff, as alleged herein.  In taking action, as alleged herein, to aid and abet, and substantially assist the commission of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of its/his/her primary wrongdoing, and realized that its/his/her conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing alleged herein.

92.    **Alter Ego**.  There is a unity of interest between and among all Defendants, and each acts as the alter ego of the other.

93.      **Defendants' Authorization and Ratification of Conduct By Persons and Entities Described Herein**.  Plaintiff is informed and believes, and thereon alleges, that each of the persons and/or entities who made alleged affirmative misrepresentations or otherwise engaged in fraud, deceit or other actionable misconduct, as alleged herein, engaged in such conduct as the authorized agents, employees or co-conspirators of each of the other named Defendants.  At the time of the making of such misrepresentations or engaging in such misconduct, Defendants were acting within the course and scope of said agency, employment or conspiracy; and with full authorization, aid, abetting, encouragement, and assistance of each of the other named Defendants.  Moreover, each of the named Defendants expressly or impliedly ratified and adopted said misconduct.

94.      **Tolling of Applicable Statutes of Limitation by Fraudulent Concealment.** Any applicable statutes of limitation have been tolled by Defendants' intentional fraud, deceit, and continuing, knowing, and active concealment of the facts alleged herein.

95.      Alternatively, Defendants should be estopped from relying on any statutes of limitation.  Defendants owed Plaintiff an affirmative duty of full and fair disclosure, but knowingly failed to honor and discharge such duty.  Moreover, Defendants' conduct is not barred by any statutes of limitation because Defendants' conduct constitutes an ongoing violation of Plaintiff' rights, which continues to the present.

96.      **Background on the foreclosure crisis.**  For the past six years, the United States has been in a foreclosure crisis.  By late 2009, one in eight (1/8) U.S. mortgages was in foreclosure or default, and 2.8 million homeowners received foreclosure notices in 2009.

97.     California has been one of the states hardest hit by the foreclosure crisis. California had the highest number of foreclosures in the United States for all of 2009.  RealTrac reports that the number of total California properties with foreclosure filings in 2009 was 932,573.  This represents a nearly 21% increase over 2008 and a 153% increase from 2007.  In the first quarter of 2010, California posted the nation's fourth (4th) highest foreclosure rate; during that period, California accounted for fully twenty-three percent (23%) of the nation's total foreclosure activity.

98.     The foreclosure crisis "continues unabated", as a Congressional oversight panel stated in April 2010. However, lender misconduct has been far more rampant in California, including, but not limited to, the manner in which lenders promised, processed and approved loan modifications.

99.     Bartlett and Patera's loan modification process began in March 2011, when Bartlett first requested a loan modification application.  Bartlett and Patera have applied for loan modifications on all three of their mortgage loans since then, and they have received numerous approvals, as well as notices of defaults and foreclosure notices.

100.     Thereafter, Plaintiff suffered from the same modification nightmare suffered by millions of other homeowners.

101.     Defendant's agents, employees, and/or co-conspirators repeatedly and uniformly made misrepresentations to Plaintiff.

102.     Defendants also wrongfully failed to provide adequate warnings and otherwise concealed material facts from Plaintiff, including, *inter alia*, (1) that Defendants always secretly intended to deny Plaintiff a permanent loan modification, despite their numerous promises to the contrary, (2) that once Defendants executed their plan to deny Plaintiff's modification, Plaintiff

would be threatened with imminent foreclosure unless she could miraculously manage to immediately pay off all accrued arrearages, (3) that Defendants would intentionally and/ or negligently prolong the modification to set Plaintiff up to lose her home through foreclose or short sale, (4) that Defendants would intentionally and/ or negligently prolong the modification process because the federal government paid Defendants for loan modification applications, and (5) that Defendants were engaging in illegal "dual-tracking" by secretly seeking foreclosure at the same time they were ostensibly giving Plaintiff a chance to save her home by loan modification, and (6) that Defendants never actually considered modification of Plaintiff's loan.

103.    Throughout this whole unethical process and during lengthy blocks of time, Plaintiff was not communicated to by agents, employees, and co-conspirators of Defendant Citibank and its co-defendants, including, without limitation, Citibank representatives. When Plaintiff was communicated to, Citibank representatives made numerous promises, including that they were trying to reform Plaintiff's loan and would not foreclose.

104.    Plaintiff was repeatedly and periodically required to provide the same redundant information and supporting documentation, over and over again in 2013 while still failing to get an underwriting answer.  Plaintiff was also constantly transferred over to brand new Citibank (and its predecessor in interests') loan modification agents (at least 4 separate CitiMortgage representatives were "handling" the loan modification applications in 2013 alone), including but not limited to various self-identified  "customer relations agents" and "personal relations agents", who would require Plaintiff to repeat the whole story again from the beginning, and continually reproduce documents.  Despite receiving the entire story and documentation, these "new" representatives would otherwise further delay and prolong the loan modification process and

waste Plaintiff's time, energy, and money.  Plaintiff repeatedly complied, for fear of losing her home to foreclosure or short sale.

105.   While Defendants kept Plaintiff running after the illusion of a permanent loan modification, and made her go through many hurdles, Defendants were actually working to toward foreclosing on Plaintiff's home.

106.   This **dual-tracking** approach was expressly outlawed by both the clear language of the CAHBR, and by the Controller of the Currency, under a division of the U.S. Treasury Department, pursuant to a Consent Order issued on April 13, 2011.  The Consent Order forced banks like Citibank, and several other banks to cease and desist their predatory lending practices including this dual-tracking approach.  A summary of the Consent Order published in the San Francisco Chronicle reads as follows:

> Going forward, banks may no longer simultaneously proceed with both loan modifications and foreclosures.  That 'dual track' process resulted in many cases where homeowners who were making trial loan modification payments suddenly have their homes repossessed.  Banks must establish a single point of contact-either one person or a team-for homeowners seeking assistance.  Many struggling homeowners say they had Kafkaesque experiences over and over again, each time explaining their situation from scratch to a new bank representative.  Banks must also develop plans for staffing, training and oversight of outside firms.  Banks' plans for correcting foreclosure problems will be supervised by bank regulators." [See the attached front page article from the April 14, 2011 edition of the San Francisco Chronicle].

107.   Defendants then used guarantees of loan modification, so Defendants would have both the time and the opportunity to foreclose on (or short sell) the Property.

108.   CitiMortgage's lack of communication and response to Plaintiff's request for payment history, broken down payoff demands to reflect arrearages, *etc.* prevented Plaintiff from having the necessary details to negotiate or determine what actually was occurring and required on the loans.

109.     Plaintiff further alleges on information and belief that Defendants' senior management personnel (including one or more self-identified "Directors" and "Senior Vice Presidents") were highly motivated to lie to Plaintiff and either refused to respond to Plaintiff's requests or misinformed Plaintiff on the status, preventing Plaintiff from taking reasonable actions and mitigating damages.

110.     Throughout the entire modification process described above, Defendants' sales agents continuously deceived Plaintiff with lies, false promises, intentional misrepresentations and concealment of material facts.  Plaintiff justifiably relied upon Defendants' fraud, deceit and other actionable misconduct, which caused Plaintiff to suffer damages as discussed below.

111.     However, in truth, these gross misrepresentations were made to lull Plaintiff into a false sense of well-being while Citibank and other Defendants secretly worked to seize Plaintiff's home by foreclosure and cause other financial harm to Plaintiff.  Defendants are guilty of using illegal "dual-track" tactics (*i.e.*, simultaneously pursuing foreclosure and loan modification), which is specifically forbidden by the Controller of Currency, a division of the United States Department of the Treasury, as well as by the CAHBR, because it is unconscionable for a bank to hold out the "carrot" of a loan modification while simultaneously and surreptitiously wielding the "hammer" of foreclosure against the unsuspecting homeowner.

112.     Significantly, Defendants also had a huge profit motive to wrongfully induce Plaintiff into loan modification procedures, because Defendant Citibank (and its predecessors in interest) made millions of dollars each month (from the federal government) as HAMP servicers.

113.     The Chicago Tribune  provides further insight into the Defendants' strong economic motive to commit financial atrocities, i.e., in May 2011 (in a single month) the federal

Complaint for Damages-24

government paid approximately $24 Million to the three largest servicers, i.e., Bank of America ($7.2 Million), JP Morgan Chase ($8 Million), and **Citibank ($8.7 Million)**.

114.    Alternatively, to the extent that Defendants' improper loan modification practices were merely negligent, rather an intentional as described above, Plaintiff is informed and believes that Defendants' rampant greed caused them to negligently take far more clients than they could reasonably process.  These tactics, employed by Defendants, caused delays, denial of modification and catastrophic harm as a direct and proximate result.

115.    **Defendants Owed Fiduciary Duties to Plaintiff.**   Defendants' decision to act as lending brokers or "loan modification brokers" to help Plaintiff obtain a loan modification and other pecuniary benefits from the federal government, and other external sources, gave rise to fiduciary duties under *Smith v. Home Loan Funding, Inc.*, (2011) 192 Cal.App.4th 1331.  The court in *Smith* held that fiduciary duties arise when a mortgage lender improperly acts in the capacity of a mortgage broker, *i.e.*, "shops around" to help the clients obtain money or some other pecuniary advantage for a mortgage from *outside* sources, rather than from the lender itself as part of an *internal* application and review process.

116.    A "broker" is broadly defined in Black's Law Dictionary (5th ed. 1979), in pertinent part, as follows:

> Broker.  An agent employed to make bargains and contracts for a compensation….A middleman or negotiator between parties….A person whose business it is to bring a buyer and seller together.  The term extends to almost every branch of business, to realty as well as personally. [Pages 174-175].

Significantly, normal lenders just accept an application and render a decision within a short period of time based on the borrowers' financial condition, but Defendants' conduct was much different because they were trying to "shop around" and "fit" Plaintiff for an *outside program*,

*i.e.*, HAMP, rather than making an internal decision based on its own *internal* modification criteria and processes.

117.    Accordingly, in this case, Defendants owed ***fiduciary duties*** to Plaintiff because Defendants chose to act as ***lending brokers*** to help Plaintiff obtain HAMP relief from the federal government and other *outside* entities and organizations, rather than acting as a normal lender processing the loan modification application for *internal* review and approval.  See *Smith v. Home Loan Funding, Inc.,* (2011) 192 Cal.App.4th 1331.

118.    **Fiduciary duties also arise from a "confidential relationship**", whenever one voluntarily accepts or assumes the confidence of another, which demands that he may not act so as to take advantage of the other's interests without the other's consent.  *Tri-Growth Centre City, Ltd. V. Silldorf, Burdman, Duignan and Eisenberg* (1989) 216 Cal.App.3d 1139, 1150.  A fiduciary duty or confidential relationship is created and exists under the law when a person reposes trust and confidence in another, and the person in whom such confidence is reposed obtains control over another person's affairs.  The confidential relationship distinguishes constructive fraud from other forms of actual fraud, including negligent misrepresentations, which may occur in any type of relationship.  *Byrum v. Brand,* 219 Cal.App. 3d 926, 937-938, 268 Cal.Rptr. 609, 617-618 (1990).

119.    Confidential relationships may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another.  *Kloehn v. Prendiville*, 154 Cal.App. 2d 156, 160-161, 316 P.2d 17, 21 (1957).  In determining whether a fiduciary relationship exists, courts are required to look at the facts of each individual case and the particular relationship at issue.  *Kudokas v. Balkus* (1972) 26 Cal.App3d 744, 750. The

relationships and duties involved need not be of a legal nature; they may be moral, social, domestic or merely personal. *Pryor v. Bristine* (1963) 215 Cal.App.2d 437, 446.

120.    *In Re: Daisy Systems Corp*. (9th Circuit 1996) 97 F.3d 1171 expanded the traditional fiduciary duties to find that an investment banking firm owed fiduciary duties even through its clients were also sophisticated business persons.

121.    A confidential relationship giving rise to fiduciary duties manifested here. Defendants actively sought and willingly accepted the role of "modification experts" working to help Plaintiff and other clients save their homes.

122.    Naturally, a "confidential relationship" arose from Plaintiff's reasonable reliance upon Defendants' representations concerning the modification efforts, that Defendants agreed to perform to help Plaintiff and other clients keep their homes.  Defendants clearly held all of the power in this relationship.  If Defendants told Plaintiff to do something, Plaintiff had absolutely no recourse but to comply with Defendants' demands.  If Plaintiff refused, she knew Defendants would kill the loan modification she desperately needed to survive.  Defendants clearly had all the power in this relationship.

123.    Desperate circumstances of possible foreclosure (or short sale) forced Plaintiff to trust Defendants.  The circumstances compellingly show Defendants willingly and intentionally assumed fiduciary duties as loan modification brokers and financial experts within this confidential relationship.

124.    Defendants clearly owe duties to Plaintiff here.  It is well established that a bank may be liable in negligence if it fails to discharge its contractual duties with reasonable care. *Chazen v. Centennial Bank* (1998) 61 Cal.App.4th 532,537.  Moreover, the very recent case of *Alvarez v. BAC Home Loans Servicing, L.P.* (August 7, 2014, A138443)—soon to be published

in Cal.App. 4th, held that **banks (lenders) owe a duty of care to borrowers**, to **properly review** their loan modification requests.  The *Alvarez* court held that once a bank (like Bank of America) is alleged to have agreed to consider a borrower's loan modification application, the ***bank owes those borrowers a <u>duty of care</u> to properly process the applications***.  In reaching the conclusion that Bank of America could owe the Plaintiff (borrowers) a duty of care, the appellate court in *Alvarez* considered that a borrower's lack of bargaining power, coupled with conflicts (of interest) that exist in the modern loan servicing industry, provide a ***moral imperative*** that those with the controlling hand be required to ***exercise reasonable care*** in dealing with a borrower seeking a loan modification.  Finally, the *Alvarez* court noted that the disfavored practice of "dual tracking" in finding a potential ***duty of (reasonable) care***.

125.    *Commercial Standard Ins. Co. v. Bank of America* (1976) 57 Cal.App.3d 241, 248 provides valuable insight into banks' flawed claim that no duty of care exists to support negligence claims.  The court correctly opined that, "having agreed to and undertaken to disburse the [construction] loan proceeds in accordance with the value of the construction as it progressed, Bank owed to [borrower] the duty to exercise reasonable care in so doing".

126.    A duty of care also arose because Defendants "actively participated" in torts and other misconduct going far "beyond the domain of a usual money lender," thereby exposing the bank(s) to liability under the rule in *Casey v. U.S. Bank Nat. Assn*. (2005) 127 Cal.App.4th 1138, 1144-1145. ("Casey Rule").

127.    The Casey Rule established that a bank may even be liable for aiding and abetting torts committed by third parties when it renders "substantial assistance" to a tortfeasor during a business transaction, that is, knowingly aids in the commission of the tort. *Casey v. U.S. Bank Nat. Assn., supra*, 127 Cal.App.4th 1138, 1144-1145.

128.   *A fortiori*, it cannot reasonably be imagined that the banking Defendants in this case are somehow absolved of liability for their own torts just because of the lending context.

129.   A duty was also imposed by *J'Aire Corp. v. Gregory (*1979) 24 Cal. 3d 799, 803, because (1) the aforesaid transactions were intended to directly affect Plaintiff; (2) the foreseeability of the harm ultimately suffered by Plaintiff was obvious (*e.g.* foreclosure and/or loss of equity due to decreased marketability and/or deficiency); (3) there is absolute certainty that Plaintiff actually suffered such injury (*e.g.*, foreclosure or loss of equity due to marketability issues and/or deficiency is foreseeable); (4) there is a direct connection between the Defendants' conduct and the injury suffered; (5) the moral blame attached to seizing/stealing a home and causing such harm is powerful; and (6) the policy of preventing future harm is unquestionable (*i.e.,* rogue banks are committing fraud to steal homes in multiple jurisdictions and must be stopped).

130.   A general duty also requires every person to use ordinary care to prevent injury to others (determined on a case-by-case basis). *Welrum v. RKO Gen., Inc.,* 15 Cal.3d 40, 123 Cal.Rptr. 468 (1975).  Defendants clearly owed a general duty of care to Plaintiff as a foreseeable victim of their misconduct.

131   Defendants actively participated in the described harmful situation in a manner that went far beyond the domain of the usual "money lender", and Defendants also exercised substantial control over the course and development of the situation that caused harm.

132.   First, it is uncontestable that a bank may be liable for its own tortious conduct during business transactions, *e.g*., that foreclosure, the loss of equity, or a short sale deficiency is foreseeable, that it exercises substantial control over the course and development of the situation that caused the harm.

133. First, it is uncontestable that a bank may be liable for its own tortious conduct during business transactions, *e.g*., Defendants' fraudulent, negligent, and wrongful performance of loan modification procedures in their capacity as a broker and highly paid intermediary between clients like Plaintiff and HAMP or other outside programs designed to assist homeowners to obtain a fair loan modification. Banks are commonly held responsible for their own torts.

134. Second, Plaintiff is informed and believes that Defendants actively participated in this harmful situation in a manner that went far beyond the domain of the usual money lender, so a duty exists despite *Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1096, which fully acknowledged that a bank may be liable for aiding and abetting a tort when it actively participated with a tortfeasor during a business transaction like the situation in *Casey v. U.S Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1144-1145.

135. Plaintiff alleges on information and belief that Defendants breached fiduciary duties created by *Smith* and *Alvarez* and other duties owed to Plaintiff because (1) Defendants intentionally planned to "steal" Plaintiff's home via wrongful foreclosure or damage marketability and therefore collect on a deficiency, or alternatively, (2) Defendants were more interested in collecting millions of dollars a month in servicing fees than they were in actually obtaining a fair loan modification for Plaintiff and their other clients.

136. Defendants also sorely breached these duties to take unfair advantage of Plaintiff. Defendants also callously reneged on promises that modification was assured, that there was no need to fear foreclosure and that the modification process would NOT cause Plaintiff to incur penalties, fees, costs, or other damages. Defendants also improperly reviewed and processed

Plaintiff's loan modification applications.  Again, all of the alleged misconduct was committed directly by Defendants.

137.    Once Plaintiff fell into Defendants' trap, Plaintiff could not climb out because of the excessive penalties and other problems caused by Defendants' misconduct.

138.    To summarize, Plaintiff was led down the proverbial "garden path", while at the same time, unbeknownst to her, Defendants were setting her up for a foreclosure to seize Plaintiff's home through "dual-tracking" practices explicitly condemned under both state (the CAHBR) and federal law, as articulated by the Controller of the Currency.

## **FIRST CAUSE OF ACTION**

(Deceit--Promise Made Without Intent to Perform)
AGAINST all Defendants

139.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 138 herein above as if fully set forth at length.

140.    The representations made by Defendants were in fact false.  The true facts were (1) that there was no adequate review of the loan modification process; (2) Defendants did not intend to proceed with a loan modification; (3) Defendants intended to proceed with foreclosure proceedings or other means that would benefit Defendants financially, to Plaintiff's detriment; and (4) that the foreclosure process would be ongoing, as opposed to Defendants' representation that this action would be precluded in favor of the loan modification process.

141.    During the time Plaintiff was in the loan modification process, Defendant Citibank indicated they would not undertake foreclosure proceedings.  At various times Plaintiff was either told the Property was not in foreclosure or that it would not go into foreclosure, due to the fact that it was undergoing the "underwriting" process for one or more loan modification(s). This is evidence of dual- tracking, which was at first outlawed by the Controller of the U.S.

Treasury and was subsequently outlawed in California through the enactment of the CAHBR, effective January 1, 2013.

142.    Plaintiff was told that any costs and fees associated with recordation, as well as attorney's fees, would be waived.

143.    When Defendants made these representations, it/ they knew them to be false and made these representations with the intention to deceive and defraud Plaintiff and to induce Plaintiff to act in reliance on these representations.

144.    Plaintiff's reliance on Defendants' representation(s) was justified because she believed that Defendants would operate in good faith and not lie to her at every chance they got.

145.    As a proximate result of the fraudulent conduct of Defendants as herein alleged, Plaintiff has been damaged in an amount according to proof.

146.    The representations and failures to disclose information and the suppression of information herein alleged to have been made by Defendants were made with the intent to induce Plaintiff to act, or not act, in the manner herein alleged in reliance thereon.

147.    At the time these failures to disclose and suppress facts occurred, and at the time Plaintiff took the actions herein alleged, Plaintiff was ignorant of the existence of the facts which Defendants suppressed and failed to disclose.

148.    The true facts could not have been discovered in the exercise of reasonable diligence, as they were actively concealed and suppressed by Defendant CITIBANK, their agents, and their predecessors in interest.

149.    Based on the allegations set forth in the "General Allegations" sections, which is fully incorporated by reference herein, this claim is stated with adequate specificity.  An exception to the strict pleading standard for fraud is recognized when it appears the facts lie more

within Defendants' knowledge than Plaintiff's.  *Committee on Children's Television, Inc. v.*

*General Foods Corp.*, (1983) 35 Cal.3d. 197, 2016. In that case, the California Supreme Court

unequivocally held that:

> Certain exceptions….mitigate the rigor of the rule requiring specific pleading of the
> fraud.  Less specificity is required when "it appears from the nature of the allegations that the
> defendant must necessarily possess full information concerning the facts of the controversy"
> [citations]; "even under the strict rules of common law pleading, one of the canons was that less
> particularity is required when the facts lie more in the knowledge of the opposite party…." *Id.*
> (Emphasis added).

150.    Consequently, a party is no longer required to plead with common law exactness,

and less particularity is needed where it appears from the nature of the allegations that the

defendant(s) must necessarily possess full information concerning the facts of controversy.

*Simons v. County of Kern* (1965) 234 Cal.App.2d 362, 367; *Schessler v. Keck*, (1954) 125

Cal.App.2d 827, 835-836.

151.    Fraud is sufficiently pled when the complaint sets out a representative selection of

the alleged misrepresentations sufficient to permit the trial court to ascertain whether the

statements were material and otherwise actionable. *Goldrich v. National Y Surgical Specialties,*

*Inc.,* (1994) 25 Cal.App. 4th 772, 782, citing *Committee on Children's Television, Inc. v. General*

*Foods Corp. (1983)* 35 Cal.3d 197, 218.  Plaintiff have met their burden.

152.    Likewise, *Charpentier v. Los Angeles Rams Football Co.* (1999) 75 Cal.App. 4th

301, held that fraud was sufficiently pled against a corporate defendant with superior knowledge

of the underlying facts, when Defendant "cannot persuasively complain it misunderstands the

fraud claim made", and discovery will allow the parties to find out more specifics about "who

made the representations and by what means".

153.    Based on the foregoing authority, Plaintiff's claims are properly alleged.  The

misconduct surrounding Defendants' fraud and deceit is exclusively within Defendants'

knowledge, so Plaintiff is not required to, and cannot reasonably be expected to provide details until after they have had an opportunity to conduct the full range of discovery in this case.

154.    Further, since Plaintiff could not reasonably be expected to, and in actuality did not anticipate Defendants' fraud and deceit, Plaintiff was not reasonably required to take scrupulous notes concerning Defendants' misrepresentations (*e.g.*, who, what, when, how), so the Complaint's representative sample of details regarding those misrepresentations is sufficient for pleading purposes. *National Y Surgical Specialties, Inc.,* (1994) 25 Cal.App. 4th 772, 782, citing *Committee on Children's Television, Inc. v. General Foods Corp. (1983)* 35 Cal.3d 197, 218.

155.    The Complaint fully recites "Defendants' Misrepresentations," *supra*, which included both affirmative representations and concealments or nondisclosure of material facts unknown to Plaintiff.

156.    Defendants had full knowledge of the falsity of said misrepresentations and of Plaintiff's actual and justifiable misapprehension of the true circumstances concealed by Defendants.  Defendants engaged in such misconduct with the intent to defraud Plaintiff (*i.e.*, to induce action in reliance on the misrepresentations and concealment).   Plaintiff justifiably relied on said misrepresentations and concealment and, as a proximate result, Plaintiff suffered damages for each of the Defendants.  Thus, Fraud and Deceit is clearly established here under all of the alleged theories.  *Lazar v. Superior Court (1996) 12 Cal.4th 631.*

157.    The aforementioned conduct of Defendants constituted intentional misrepresentation, deceit, and/or concealment of material facts known to the Defendants with the intention on the part of the Defendant(s) of thereby depriving Plaintiff of property, and directly

led to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages.

WHEREFORE, Plaintiff prays judgment as set forth herein below.

## SECOND CAUSE OF ACTION
(Deceit-Intentional Misrepresentation)
AGAINST all Defendants

158.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 157 above as if fully set forth herein at length.

159.    Defendants have suppressed information regarding the terms of the loan, in violation of State Regulations.

160.    When Defendants CITIBANK and their agents, employees, or representatives and predecessors in interest made these representations, they knew them to be false.  Further, Defendant CITIBANK made these representations with the intention to deceive and defraud Plaintiff, and to induce Plaintiff to act in reliance on these representations in the manner herein alleged, or with the expectation that Plaintiff would so act.

161.    Plaintiff, at the time these representations were made by the Defendants, and at the time Plaintiff took the actions herein alleged, were ignorant of the falsity of Defendants' representations and believed them to be true.   Defendant CITIBANK, acted with intentional, malicious, and/or conscious disregard for Plaintiff's rights and well-being.

162.    The true facts were and could not have been discovered in the exercise of reasonable diligence as they were ***actively concealed and suppressed by Defendants***, and each of them because Defendants continuously told these lies to Plaintiff, telling her that Plaintiff would not be put into foreclosure so long as she continued to work with Defendants and submit documentation/information, that so long as she was in the loan modification review process, she

would not be foreclosed upon. Plaintiff did so, working with multiple agents of CITIBANK during the course of 2013, relentlessly, with every single agent from CITIBANK telling Plaintiff that she would not be foreclosed on so long as she continued to submit the paperwork required, even though such paperwork had already been submitted multiple times, or even though it was the Defendants that had lost the (previously submitted) paper work.

163.    The aforementioned conduct of Defendants was an intentional misrepresentation, deceit, or concealment of a material fact(s) known to the Defendants with the intention on the part of the Defendants(s) of thereby depriving Plaintiff of her property or legal rights or otherwise causing injury, and constituted despicable conduct that subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages.

WHEREFORE, Plaintiff pray for judgment as set forth herein below.

### THIRD CAUSE OF ACTION
(Fraud and Deceit-Suppression of Material Facts)
AGAINST all Defendants

164.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 163 above as if fully set forth herein at length.

165.    The misrepresentations and failures to disclose information and suppression of information herein alleged to have been made by Defendants were made with the intent to induce Plaintiff to act, or not act, in the manner herein alleged in reliance thereon. These representations, such as that Plaintiff's foreclosure sale would not be moved, or would be moved, or was occurring, were used to mislead Plaintiff and kept Plaintiff in a constant state of fear for the loss of her home. Defendants purposefully misled Plaintiff as to the fact that sale dates would be moved or cancelled so that they could gain an advantage over Plaintiff.

166.   Defendant CITIBANK's agents and representatives failed to disclose to Plaintiff that foreclosure proceedings would occur during the loan modification process, that Defendants would ultimately deny Plaintiff a loan modification (whether or not they clearly stated such to be the final decision).  All of these affirmative statements (excluding the omissions) were in fact false with the intent to defraud and steal the equity in the Plaintiff's property.  CITIBANK's agents and representatives were well aware of the falsity of the statements when they were made.

167.   Plaintiff justifiably relied on these false statements and was lead to believe that if she submitted the necessary financial documents that she would qualify for a loan modification.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

## FOURTH CAUSE OF ACTION
(Fraud and Deceit-Negligent Misrepresentation)
AGAINST all Defendants

168.   Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 167 herein above as if fully set forth at length.

169.   Defendant CITIBANK, and its agents and predecessors in interest, extended itself out to Plaintiff and continuously represented to Plaintiff that Defendants would help Plaintiff save her home through the avenue of a loan modification.  Plaintiff reposed their trust in Defendant CITIBANK and its agents and predecessors in interest, and was led to believe that Defendants would help Plaintiff instead of pushing her into foreclosure because of their representations, enabling them to qualify for a loan modification.

170.   Further, Defendant CITIBANK and its agents and predecessors in interest had a duty to act as any reasonable agent would to Plaintiff's benefit and not detriment.  CITIBANK and its agents and predecessors in interest had extended themselves to Plaintiff through this loan modification scheme and had the duty not to lie to their borrowers or make blatant

misrepresentations.  In the very least, CITIBANK and its agents and predecessors in interest had the duty to reasonably oversee their agents and not allow such blatant misrepresentations to occur.

171.   When Defendants made these representations, it/they had no reasonable ground for believing them to be true.

172.   Defendants made these representations with the intention of inducing Plaintiff to act in reliance upon these representations in the manner alleged, or with the expectation that Plaintiff would so act.

173.   Based on the allegations set forth in the "General Allegations" section (*i.e.* fraud and deceit in connection with the loan modification(s), wrongful foreclosure, which is fully incorporated by reference herein, this claim is stated with adequate specificity.

174.   Defendant CITIBANK and its agents told Plaintiff they would not proceed with foreclosure proceedings during the loan modification process.  They told Plaintiff several times that the loan modifications "looked good", and then failed to provide the modification documentation, and that late fees, interest, *etc.* would be waived.

175.   Plaintiff justifiably relied on these false statements and was lead to believe that if she submitted the necessary financial documents that she would qualify for a loan modification.

**FIFTH CAUSE OF ACTION**
(Negligence)
AGAINST all Defendants

176.   Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 175 herein above as if fully set forth at length.

177.   For reasons comprehensively discussed above, Defendants owed Plaintiff fiduciary and standard duties of care. Plaintiff also argues that principles of strict "financial

product" liability should also impose liability upon Defendants.  Those allegations are fully incorporated herein by reference as though fully set forth verbatim.

178.    Defendants also owed a duty to Plaintiff to adequately disclose information to Plaintiff regarding the loan and to act in accordance with banking industry practice, statute, and regulations, and to act with respect to Plaintiff in good faith and with fair dealing.

179.    Defendant CITIBANK and its agents and predecessors in interest extended themselves out to Plaintiff and continuously represented to Plaintiff that Defendants would help Plaintiff save her home through the avenue of a loan modification.

180.    Defendant(s) and each of them negligently breached such duties.

181.    As a direct and proximate result of the negligence of Defendants, Plaintiff has suffered general and specific damages, in an amount according to proof, as well as severe emotional distress, which has been documented.

182.    Furthermore, Defendants have mishandled Plaintiff's loan modification applications numerous times, which in itself constitutes negligence--in *Garcia v.Wells Fargo Loan Servicing, LLC.* (N.D.Cal. 2010) 2010 U.S.Dist. Lexis 45375, the court analyzed the factors articulated in *Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, for determining whether a defendant owes plaintiff a legal duty, and concluded that a financial institution that accepts a loan modification application has a duty not to hinder the borrowers' ability to qualify for modification by mishandling the application documents.  Finally, in *Ansanelli v. JP Morgan Chase, WL 1134451*, the court held that the defendant went beyond its role as a mere money lender when it offered an opportunity to Plaintiff for loan modification. This is precisely beyond the domain of a usual money lender, giving rise to a duty of care.  In any case, should there be any doubt, the *Alvarez* court, *supra*, made it absolutely clear (in August

of this year) that a duty of (reasonable) care is owed to the borrower(s), to properly process loan modification applications, once received.

WHEREFORE, Plaintiff prays judgment as set forth herein below.

## SIXTH CAUSE OF ACTION
(Violation of Business and Professions Code § 17200 et seq.)
AGAINST all Defendants

183.   Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 182 herein above as if fully set forth at length.

184.   By virtue of the conduct hereinabove alleged, *inter alia*, Defendants have engaged in unfair business acts and practices within the meaning of section 17200 *et seq*. of the Business and Professions Code, all to Plaintiff's damage.

185.   Business and Professions Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice" and any "unfair, deceptive, untrue or misleading advertising."  Statutory unfair competition extends to all unfair and deceptive business practices, does not require the Plaintiff to prove damage as a result of defendants' actions, does not require Plaintiff to prove there was any competition or rivalry with the defendant, and limits relief to injunction and restitution.  *State Farm Fire and Cas. Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1105.  A single business act is actionable under the 1992 amendment to Section 17200.  "Section 17200 is not confined to anti-competitive business practices but is equally directed toward "the right of the public to protection from fraud or deceit."  *Committee on Children's Television, Inc. v. General Foods Corp.,* (1983) 35 Cal.3d. 197, 209.  A fraudulent activity includes any practice likely to deceive the public, even if no one is actually deceived. *Id.*(Emphasis added). An unlawful activity includes any business practice that is forbidden by law *Id.* (Emphasis added), including anything prohibited by civil, criminal, federal, state,

municipal, statutory, regulatory or court-made law (*Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 839).

186.     An unfair practice is one that offends established public policy; that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers; or that has an impact on the victim that outweighs defendant's reasons, justifications and motives for the practice. *Podolsky v. First Healthcis Corp.* (1996) 50 Cal.App.4th 632.  Unfairness is independently sufficient to state a claim. *Allied Grape Growers v. Brono Wine Co.* (1998) 203 Cal.App.3d 432, 451.

187.  Based on the foregoing, Defendants are clearly liable under Section 17200 *et seq.*, because they committed fraud, deceit, and other unconscionable misconduct to "steal" Plaintiff's home and also unlawfully employed a dual-tracking scheme.  Defendants engaged in criminal and tortious fraud in a manner that was, at the very least, incredibly unfair.

188.     The foregoing violations were in furtherance of the fraud perpetuated on Plaintiff.

189.     The foregoing fraudulent concealments, material misstatements, and the intentional violations of state and federal statutes cited herein constitute unlawful, unfair and fraudulent business acts or practices and so constitute unfair business practices within the meaning of the California Unfair Practices Act.  Cal. Bus. & Prof. Code § § 17200, 17500. Section 17200 *et seq.*  of the California Business and Professions Code provides, in the disjunctive, for liability in the event of any such unlawful, unfair, or fraudulent business act or practice."

190.     As a result of the actions, concealment and deceit described herein, Plaintiff has suffered material financial injury in fact, including as described elsewhere in this Complaint, loss of equity in her home, costs and expenses related to protecting herself, a reduced credit score,

unavailability of credit, increased cost of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

## UNFAIR BUSINESS PRACTICE OF DUAL-TRACKING OF MODIFICATION AND FORECLOSURE

191.   As a separate and independent basis for this cause of action, as pled fully in the above paragraphs, which is fully incorporated herein, Defendants committed unfair business practices by misleading Plaintiff as to the status of her loan modification, and the status of her foreclosure sale, and by subjecting Plaintiff's home to an eventual foreclosure track after promising to review her loan modification first, and while the modification was still pending. This practice caused actual damage to Plaintiff in the loss of credit and associated monetary damages.  It is a violation of California state law, and the Business and Professions Code § 17200 to violate any law--state or federal, and Plaintiff is therefore entitled to treble damages and attorney's fees.

192.   As a result of the foregoing unlawful conduct, Plaintiff suffered further injury in fact by the filings of notices of default and as such Plaintiff suffered monetary loss.  Such injuries and loss included diminished access to credit, fees, and costs, including, without limitation, attorneys' fees and costs with respect to wrongful notices of default and loss of the value of and equity in the Property.

193.   The foregoing unlawful activities were pervasive and violate Business and Professions Code § 17200 *et seq.*

194.     Plaintiff is also entitled to the issuance of a ***temporary restraining order***, a ***preliminary injunction***, and a ***permanent injunction*** restraining and enjoining Defendants from any further attempt to initiate or prosecute foreclosure proceedings against Plaintiff's Property.

195.     Plaintiff is entitled to such relief as set forth in this Cause of Action and such further relief as set forth below in the section captioned "Prayer for Relief" which is by this reference incorporated herein.

196.     Pursuant to B&P Code § 17203, Plaintiff prays for Defendants to be ordered to restore to Plaintiff all funds required by any act or practice declared by this Court to be unlawful or fraudulent or that constitutes unfair and/or fraudulent business practices.

WHEREFORE, Plaintiff prays judgment as set forth below.

## SEVENTH CAUSE OF ACTION
(Promissory Estoppel)
AGAINST all Defendants

197.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 196 herein as it fully set forth at length.

198.     Defendants made, on numerous occasions, clear and unambiguous promises to Plaintiff to work on modifying her loan, and to provide "hardship assistance.

199.     Defendants made promises to process Plaintiff's loan modification application properly and diligently.  Promises were also made by Defendant's agents that Defendants would not foreclose on Plaintiff's home while the modification application(s) were pending.

200.     Defendants reasonably expected or should have expected said promises to induce the aforementioned actions and reliance by Plaintiff.

201.    Plaintiff relied upon Defendant's promises to properly work on modifying Plaintiff's loan, to provide her with the necessary hardship assistance, and to essentially make sure that Plaintiff did not lose her home.

202.    Plaintiff's reliance on Defendant Bank's promises to properly process a modification of her loan was both reasonable and foreseeable by Defendant Bank.

203.    As a proximate result, Plaintiff has been injured by her reliance, in that she is in danger of eventually losing her home to foreclosure or losing her equity and/or enduring deficiency by short sale due to Defendants' actions affecting the marketability of the Property.

204.    An injustice can only be avoided if Defendants are bound to their promises, which should be enforced by the Court.

205.    Defendants are estopped from denying Plaintiff's reliance on the promises made by Defendants' agents as they were all schooled and required to tell Plaintiff that the banks would promptly and diligently assist Plaintiff to try to have Plaintiff keep her home.  As a result, Plaintiff has been injured by her reliance, in that she may eventually lose her home to foreclosure or short sale.

206.    Plaintiff has been damaged in an amount to be proven.

WHEREFORE, Plaintiff prays for relief as set forth herein.

### EIGHTH CAUSE OF ACTION
(Breach of Contract)
AGAINST all Defendants

207.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 206 herein as it fully set forth at length.

208.    On or about June 1, 2011, Citibank offered a loan modification of all three (3) loans on the Property.  The offer of modification was accepted when Citibank representatives

emailed the offer of modification, Bartlett then spoke to and/or emailed Citibank representatives accepting the offer, and then Citibank representatives withdrew the first modified payment from Bartlett's Citibank account.  The June 2011 loan modification is thus a valid and enforceable contract.

209.    Patera and Bartlett's obligations were performed by subsequently making the modified monthly payment(s).

210.    Thereafter, CitiMortgage refused to accept further payments, rendering it impossible for Patera and Bartlett to continue to perform.

211.    Accordingly, CitiMortgage breached its oral and written agreements entered into with Plaintiff.

212.    As a direct and proximate result of CitiMortgage's breaches, Patera suffered, and will continue to suffer, damages in an amount according to proof at trial but in excess of the minimum jurisdictional amount of this Court.


**NINTH CAUSE OF ACTION**
(Breach of Contract - October 2012 Modification Agreement)
AGAINST all Defendants

213.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 212 herein as it fully set forth at length.

214.    On or about October 9, 2012, CitiMortgage/Citibank Private Bank offered Bartlett and Patera a loan modification of all three (3) loans on the Property.  On or about October 9, 2012, Bartlett and Patera **accepted** CitiMortgage/CitibankPrivate Bank's offer.  Plaintiff contends that the June 2011 loan modification is a **valid and enforceable contract**, or alternatively the October 9, 2012 loan modification is a **valid and enforceable contract.**

215.    Despite his representations to Plaintiff, Citibank employee Stephen Eustace failed to provide a written agreement by October 10, 2012 and failed to respond to multiple inquiries from Plaintiff regarding the status of the promised written agreement, which would have memorialized the contract in writing.

216.    On or about November 1, 2012, Citibank caused to be recorded a Notice of Default on the property, utterly disregarding its agreement with Patera.

217.    Patera's ability to perform her contractual obligations were frustrated by Citibank's failure to communicate the specific payment methods and also by its failure to honor its agreement.

218.    As a direct and proximate result of CitiMortgage's/Citibank Private Bank's breaches, Patera has suffered, and will continue to suffer damages in an amount according to proof at trial but in excess of the minimum jurisdictional amount of this Court.

### TENTH CAUSE OF ACTION
(Slander of Title)
AGAINST all Defendants

219.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 218 herein as if fully set forth at length.

220.    Northwest purportedly but falsely acting as either the trustee or the agent of the beneficiary of the Deed of Trust ("DOT"),wrongfully and without privilege, caused a Notice of Default ("NOD"), Substitution of Trustee ("SOT") and the Assignment of Deed of Trust to be recorded against the Property.

221.    Thereafter, Northwest again purportedly but falsely acting as either the trustee or the agent of the beneficiary of the Deed of Trust, wrongfully and without privilege, caused a Notice of Trustee's Sale to be recorded against the Property.

222.    The aforementioned documents were filed by Northwest in the County of Contra Costa Recorder's Office, thereby making public its declaration regarding its rights to the property.

223.    The NOD and Notice of Trustee's Sale ("NOTS") were invalid statements because they were recorded in violation of the California Civil Code sections 2923.5 *et seq*., thereby misrepresenting the fact that Bartlett and Patera did not own the property.

224.    Northwest acted with reckless disregard of the truth as to whether Bartlett and Patera owned the Property.

225.    Northwest should have recognized that a third party might act in reliance on the NOD and NOTS, thereby causing financial loss to Plaintiff.

226.    By doing the acts described above, Defendants slandered Plaintiff's title to the Subject Property.

227.    The wrongful conduct of Defendants caused Plaintiff to suffer damages in an amount to be proven at trial.

### ELEVENTH CAUSE OF ACTION
(Cancellation of Instruments)
AGAINST all Defendants

228.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 227 herein as it fully set forth at length.

229.    If the wrongfully recorded Substitution of Trustee ("SOT"), Notice of Defaults ("NODs"), Assignment of Deed of Trusts ("Assignment DOT"), First Notice of Trustee Sale ("First NTS"), Second Notice of Trustee Sale ("Second NTS") instruments are left outstanding, Plaintiff will continue to suffer loss and damages.

230.    Plaintiff therefore seeks cancellation of the following recorded instruments: (a) the SOT; (b) the NOD; (c) Assignment of DOT; (d) the First NOTS; and (e) the Second NOTS.

231.    Plaintiff is informed and believes, and therefore alleges, that Defendants acted willfully and with a conscious disregard for Plaintiff's rights and with a specific intent to defraud and injure Plaintiff, by causing the SOT, NOD, the Assignment of the DOT, the first NOTS, and the Second NOTS instruments to be prepared and recorded **without a factual or legal basis** for doing so.

232.    Upon information and belief, these acts by Defendants constitute fraud, oppression and malice under Cal. Civil Code section 3294.  Defendants acted with a conscious disregard for the requirements under Cal. Civil Code section 2923 *et seq.*.

233.    By virtue of Defendants' willful and wrongful conduct as herein alleged above, Plaintiff is entitled to general and special damages according to proof.

### TWELFTH CAUSE OF ACTION
(Violation of the Rosenthal Fair Debt Collection Practices Act)
AGAINST all Defendants

234.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 233 herein as it fully set forth at length.

235.    Plaintiff is a consumer and the obligation between the parties is a debt owed pursuant to the subject notes and deeds of trusts and is a consumer debt pursuant to the Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act").

236.    Citibank and CitiMortgage are lender and mortgage servicing companies that are in the business of collecting and processing mortgage payments.

237.    Several representatives of Citibank and CitiMortgage made misrepresentations in connection with the debt secured by the Deed of Trust on the Subject Property.  Specifically,

Citibank and CitiMortgage management personnel represented that if Plaintiff submitted one or more application(s) for a loan modification, **they would not foreclose on the Property**.  These representations were false and fraudulent, as, after Bartlett and Patera entered into the agreement(s) and payment(s) were debited directly by Citibank as evidenced by substitution slips, bank statements and emails, Citibank and CitiMortgage instituted foreclosure proceedings (NOTS) on the Property anyway.

238.    As a proximate result of Citibank's and CitiMortgage's violations of the Rosenthal Act, Plaintiff is entitled to actual and statutory damages, attorneys' fees and costs, and such other relief as the Court determines is due and proper.

## THIRTEENTH CAUSE OF ACTION
(Breach of Covenant of Good Faith and Fair Dealing)
AGAINST all Defendants

239.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 238 herein as it fully set forth at length.

240.    Plaintiff and Citibank entered into agreements on two (2) occasions whereby Citibank offered a loan modification(s) to Plaintiff.

241.    Plaintiff performed as required under the terms of the agreement(s) until such point as its ability to perform was frustrated by Citibank's failure to accept payments and communicate with Plaintiff.

242.    The conditions required for Citibank's performance had occurred by virtue of the fact that Plaintiff had commenced performing by tendering monthly payment(s) to Citibank per the terms of the agreement(s).

243.    Citibank has unfairly interfered with Plaintiff's right to receive the benefits of the

Complaint for Damages-49

agreement(s) by having loan modification(s) in place for payments on the home loans of her residence, the Property.

244. Plaintiff has been harmed by Citibank's conduct by virtue of the fact that the Property has been repeatedly scheduled for foreclosure sales, interest on the principals of the loan(s) have systematically accumulated, and late fees and penalties have been imposed.

245. Accordingly, as a result of Citibank and CitiMortgage's fraudulent conduct, Plaintiff has suffered, and will continue to suffer, compensatory, general and special damages in an amount according to proof.

## **DECLARATORY RELIEF**

246. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 245 herein as it fully set forth at length.

247. Due to the dispute as to the rights and interests of the parties to the Property, Plaintiff requests that the Court declare the respective rights of the parties in this matter. Plaintiff requests that the Court enforce these rights with the issuance of injunctions or restraining orders as may be necessary to place the parties in their proper position with respect to their interests, if any, in the Property.

## **PRAYER**

Based on the foregoing, Plaintiff prays for judgment as follows, as to all causes of action:

1. For a declaration of the rights and duties of the parties, specifically that the Notice of Default(s) placed on the subject property were wrongful, illegal, and ***void ab initio***;

2. For a declaration that Plaintiff is the true and rightful owner of the property that is the subject of this lawsuit (commonly known as 308 Iron Horse Court, Alamo, CA 94507);

3. For issuance of an Order canceling the NOD(s);

Complaint for Damages-50

4. To quiet title in favor of Plaintiff and against Defendants;

5. For compensatory, special and general damages in an amount according to proof at trial;

6. For punitive damages in an amount to be determined by the Court against all Defendants;

7. Pursuant to Business and Professions Code Section 17203, that all Defendants, their successors, agents, representatives, employees and all persons who act in concert with them be **_permanently enjoined_** from committing any further acts of unfair competition in violation of Business & Professions Code Section 17200 *et seq*., including, but not limited to, the violations alleged herein.

8. For civil penalties pursuant to statutory, restitution, injunctive relief and reasonable attorneys' fees according to proof;

9. For reasonable attorney's fees and costs; and

10. For reasonable costs of suit and such other and further relief as the Court deems proper.

**As to Plaintiff's Fraud Causes of Action:**

1. For general damages in an amount according to proof;

2. For special damages for an amount according to proof;

3. For punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct;

4. For costs of suit incurred herein;

5. For preliminary and injunctive relief enjoining Defendants from foreclosing on, or otherwise interfering with, Plaintiff's real property; and

6. For such other and further relief as the court may deem proper.

**As to Plaintiff's Negligence Causes of Action:**

1. For compensatory damages in the amount to be proved at the time of trial;

2. For preliminary and permanent injunctive relief enjoining Defendants from foreclosing on, or otherwise interfering with Plaintiff's real property.

3. For exemplary and punitive damages according to proof; and

4. For such other and further relief as the Court may deem proper.

**As to Plaintiff's Cause of Action regarding the Violation of Business and Professions Code § 17200 _et seq._):**

1. Pursuant to Business and Professions Code section 17203, for Defendants to be ordered to restore to Plaintiff all funds required by any act or practice declared by this Court to be unlawful or fraudulent or that constitutes unfair and/or fraudulent business practices;

2. For reasonable attorney's fees and costs of suit according to proof at trial;

3. For preliminary and permanent injunctive relief enjoining Defendants from foreclosing on, or otherwise interfering with, Plaintiff's real property;

4. For such other and further relief as the Court may deem proper.

**As to Plaintiff's Cause of Action for Promissory Estoppel:**

1. For compensatory damages according to proof;

2. For interest in an amount according to proof;

3. For reasonable attorney's fees according to proof;

4. For costs of suit; and

//        //        //

Complaint for Damages-52

5.  For such other and further relief as the court may deem proper.


DATED:  October 9, 2014                    Respectfully submitted,

                                           LAW OFFICES OF PETER L. KUTRUBES

                                           */s/ Stephen P. Lin*

                                           Stephen P. Lin, Of Counsel
                                           Attorneys for Plaintiff,
                                           Marci Patera